UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| SURFCAST, INC., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | No. 2:12-cv-333-JAW |
| | ) | |
| MICROSOFT CORPORATION, | ) | |
| | ) | |
| Defendant | ) | |

*MEMORANDUM DECISION ON MOTION TO DISQUALIFY EXPERT WITNESS*

The plaintiff, SurfCast, Inc., seeks to preclude the defendant, Microsoft Corporation, from using Dr. Mark Ackerman as a retained expert witness. In accordance with my order following a telephone conference on this and other discovery issues, ECF No. 111, the parties have submitted letter briefs on the issue, Dr. Ackerman has provided an affidavit, and the plaintiff has submitted relevant documents *in camera*. Because I am persuaded that the plaintiff's attorneys reasonably believed that they had established a confidential relationship with Dr. Ackerman, I find that Dr. Ackerman is disqualified from serving as a retained expert for Microsoft in this case.

**I. Factual Background**

The parties do not appear to dispute that Dr. Ackerman had only one substantive conversation with plaintiff's counsel, Erica Pascal, Esq., and Tiffany Miller, Esq., and that the telephone conversation took place on August 29, 2012, and lasted 23 minutes. Prior to that telephone conversation, on August 23 or 24, 2012, Pascal sent to Dr. Ackerman via email a

1

confidentiality agreement that she asked him to sign before they could engage in any specific discussion. Dr. Ackerman signed the agreement and returned it to Pascal that same day.

On August 29, 2012, Pascal emailed Dr. Ackerman the patent that is at issue in this action. Approximately one-half hour later, the 23-minute call at issue began. Pascal and Dr. Ackerman discussed his background. Beyond that, they differ in their recollections of the conversation. They do agree that Dr. Ackerman was not paid, nor was he retained, by the plaintiff. It is undisputed that Dr. Ackerman was not asked to work on the case, to perform services in the future, or to decline to perform services for others. There has been no further contact between Dr. Ackerman and any lawyer from Pascal's firm or any other representative of the plaintiff.

## II. Discussion

Disqualification of an expert witness is "a drastic measure that courts should impose only hesitantly, reluctantly, and rarely." *Hewlett-Packard Co. v. EMC Corp.*, 330 F.Supp.2d 1087, 1092 (N.D. Cal. 2004) (citing cases).

> [D]isqualification of an expert is warranted based on a prior relationship with an adversary if (1) the adversary had a confidential relationship with the expert and (2) the adversary disclosed confidential information to the expert that is relevant to the current litigation. . . . In addition to these two factors, the Court also should consider whether disqualification would be fair to the affected party and would promote the integrity of the legal process.

*Id*. at 1092-93 (citations omitted).

The party seeking disqualification of the expert bears the burden of demonstrating that it is reasonable to believe that a confidential relationship existed; the court may consider several factors in this regarding, including

> whether the relationship was one of long standing and involved frequent contacts instead of a single interaction with the expert, whether the

2

> expert is to be called as a witness in the underlying case, whether alleged confidential communications were from expert to party or vice-versa, and whether the moving party funded or directed the formation of the opinion to be offered at trial.

*Id.* ( quoting *Stencel v. Fairchild Corp.*, 174 F.Supp.2d 1080, 1083 (C.D. Cal. 2001)).

> Other factors include whether the parties entered into a formal confidentiality agreement, whether the expert was retained to assist in the litigation, the number of meetings between the expert and the attorneys, whether work product was discussed or documents were provided to the expert, whether the expert was paid a fee, whether the expert was asked to agree not to discuss the case with the opposing parties or counsel, and whether the expert derived any of his specific ideas from work done under the direction of the retaining party.

*Id.*

Here, the relationship between Dr. Ackerman and the plaintiff's attorneys was not of long standing, nor were there "frequent contacts" between them. The defendant does plan to call Dr. Ackerman as a witness. The plaintiff did not fund or direct the formation of the opinion that Dr. Ackerman will presumably offer at trial. Dr. Ackerman and the plaintiff's attorneys did enter into a formal confidentiality agreement, but he was not retained nor was he paid a fee. Dr. Ackerman did no "work" for the plaintiff, and, thus, he could not have derived any ideas from such work. Dr. Ackerman was not provided by the plaintiff's attorneys with any confidential documents to review.

In advance. of the discovery teleconference, ECF No. 111, the court was provided with an unsigned copy of the Confidentiality and NonDisclosure Agreement that was signed by Dr. Ackerman on August 24, 2012. *See* Confidentiality and NonDisclosure Agreement dated August 24, 2012, attached as Attachment A ("Agreement"). The Agreement was drafted "to permit the Parties to engage in discussions regarding potential retention of [Dr. Ackerman]." The Agreement provides that "*all* materials and information including written and oral

communication furnished to [Dr. Ackerman] by [plaintiff's counsel], will be deemed Confidential Information" and that Dr. Ackerman "will not disseminate or disclose any Confidential Information to any person, firm, business, or other third party." (Emphasis in original.)

In *Excel-Jet, Ltd. v. United States*, Civil Action Nos. 07-cv-02181-WYD-BNB, 08-cv-01218-WYD-BNB, 2009 WL 1194936 (D. Col. May 1, 2009), the expert in question contacted the plaintiff's attorney by telephone and email. *Id*. at *5. The attorney then responded by email, describing in detail the events giving rise to his client's claim and asking him to "keep your work under wraps." *Id*. A few days later, again by email, the attorney told the expert about the attorney's theory of the causative events. *Id*. Shortly thereafter, the expert communicated directly with the plaintiff's test pilot. *Id*. The attorneys sent the expert additional information and then had a 15-20 minute telephone conversation with him, in which they told the expert, among other things, about their plans to retain others to perform certain computational work. *Id*. at *6. Finally, the expert reported some "initial opinions" to the attorneys and spoke with them again for about 15 minutes. *Id*. Three months later, the expert was retained by the defendant. *Id.* The court found that a confidential relationship had been established between the plaintiff's attorneys and the expert. *Id.* at *6-*7.

In *Veazey v. Hubbard*, Civil No. 08-00293 HG-LEK, 2008 WL 5188847 (D. Haw. Dec. 11, 2008), the defendant's attorney sent an email to the expert in question, who was then working on several cases for that attorney, stating that he would like to retain the expert in the case. *Id*. at *1. The expert replied that he was "glad to help" and instructed the attorney to send a certain retainer and any material that the attorney wished the expert to review. *Id*. The attorney responded that he would send the retainer in a few days and the autopsy report when it

4

became available. *Id*. The attorney and the expert spoke briefly about the attorney's concerns, about which he wanted the expert to comment. *Id*. Two months later the attorney's office sent the autopsy report to the expert. *Id*. at *2. The expert then informed the attorney that he had been retained by another attorney and could not discuss the case with the defendant's attorney. *Id*. The expert never received a retainer check nor did he review any documents. *Id*. The court held that it was reasonable for the defendant's attorney to believe that he had a confidential relationship with the expert. *Id*. at *6.

Finally, in *Mays v. Reassure America Life Ins. Co.*, 293 F.Supp.2d 954 (E.D. Ark. 2003), the court found that no confidential relationship existed between a certified public accountant and the plaintiff administrator of an estate, whose attorney had contacted the accountant's firm to discuss the possibility that one of its members might serve as a successor administrator of the estate. *Id*. at 955-56. The conversation lasted 60 to 90 minutes and was understood to be confidential. *Id*. at 956. The firm declined to serve as administrator. *Id*. The accountant then agreed to serve as an expert witness for the defendant. *Id*. The court noted that the plaintiff had not provided the firm with specific facts about the court case or confidential documents to review, did not discuss critical litigation strategy, and discussed information that was already a matter of media attention and therefore not confidential. *Id*. at 957.

While none of these cases is fully congruent with the facts in this case, they provide persuasive authority for the conclusion in this case that the plaintiff's attorneys reasonably believed that they had established a confidential relationship with Dr. Ackerman, based on the evidence presented.

On the second prong of the test, whether the adversary disclosed confidential information to the expert, Dr. Ackerman states that he does not recall being provided any information about

the plaintiff's strategies, the significance of any particular fact, or any confidential information at all. However, the attorneys involved in that 23-minute call have provided detailed sworn statements and copies of their notes taken during or immediately after the call that, taken together, convince me that they disclosed confidential information to Dr. Ackerman during the telephone call. Confidential information is defined as

> information of either particular significance or that which can be readily identified as either attorney work product or within the scope of the attorney-client privilege. It could include discussion of the party's strategy in the litigation, the kinds of experts the party expected to retain, the party's view of the strengths and weaknesses of each side, the role of each of the party's experts to be hired and anticipated defenses.

*Hewlett-Packard*, 330 F.Supp.2d at 1094 (citations and internal punctuation marks omitted). The party seeking to disqualify the expert must point to specific and unambiguous disclosures that if revealed would prejudice that party. *Id.* The plaintiff in this case has submitted *in camera* evidence that meets this standard. *See generally Park v. Southeast Service Corp.*, C/A No. 3:10-cv-2949-JFA, 2011 WL 3794266 (D.S.C. Aug. 24, 2011). Attorney Pascal's declaration, made as an officer of the court, sets out several specific issues, both informational and strategic, that were discussed with Dr. Ackerman. Those details are supported by the copy of her contemporaneous notes of the conversation, and those of her colleague, Ms. Miller, that were submitted with the declaration. The declaration and the notes support the plaintiff's contention that, during their telephone call with Dr. Ackerman, the attorneys discussed their litigation strategy and theories of recovery against Microsoft.

      To be sure, my conclusion places a burden on the defendant, which may have to locate and prepare another expert witness. It is not clear from the parties' submissions whether this will be necessary. If necessary, the court will adjust its scheduling order to accommodate this event, but the defendant is reminded that it chose to go ahead with Dr. Ackerman as its expert after he

informed the defendant of his contact with the plaintiff's attorneys. To some extent, therefore, this burden is self-imposed.

### III. Conclusion

For the foregoing reasons, the plaintiff's oral motion to disqualify Dr. Ackerman as an expert witness for the defendant is **GRANTED**.

### *NOTICE*

*In accordance with Federal Rule of Civil Procedure 72(a), a party may serve and file an objection to this order within fourteen (14) days after being served with a copy thereof.*

*Failure to file a timely objection shall constitute a waiver of the right to review by the district court and to any further appeal of this order.*

Dated this 30th day of September, 2013.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge

## CONFIDENTIALITY AND NONDISCLOSURE AGREEMENT

This **Confidentiality and Nondisclosure Agreement** (the "**Agreement**") is entered into by and between DLA Piper US LLP ("DLA Piper") on the one hand and Mark S. Ackerman (the "**Undersigned**"), on the other hand (collectively referred to herein as the "**Parties**") to permit the Parties to engage in discussions regarding potential retention of the Undersigned for services to be provided to DLA Piper and its Client.

1. **Confidential Information.** The Undersigned acknowledges that he may be provided with information and materials that are proprietary and confidential to DLA Piper and its Client. Confidential Information includes, but is not limited to, information and materials covered by the attorney work product doctrine, trade secrets, and other commercial and proprietary materials and information. Unless otherwise indicated in writing, all materials and information including written and oral communications furnished to the Undersigned by DLA Piper will be deemed Confidential Information.

2. **Nondisclosure and Nonuse Obligations.** The Undersigned agrees that Confidential Information shall only be used by the Undersigned for purposes of the above-mentioned discussions with DLA Piper. The Undersigned agrees that he will not disseminate or disclose any Confidential Information to any person, firm, business, or other third party. The Undersigned further agrees that he shall not disclose Confidential Information to his employees and agents absent written permission from DLA Piper. The Undersigned will immediately give notice to DLA Piper of any unauthorized use or disclosure of the Confidential Information.

3. **Exclusions from Nondisclosure and Nonuse Obligations.** Notwithstanding the foregoing, this Agreement will not apply to any information that becomes generally available to the public other than as a result of disclosure by the Undersigned or information that is legally required to be disclosed by the Undersigned.

4. **Ownership and Return of Confidential Information.** All Confidential Information furnished to the Undersigned by DLA Piper remains the property of DLA Piper and its Client. At DLA Piper's request and no later than five (5) days after such request, the Undersigned shall destroy or deliver to DLA Piper, at DLA Piper's option, (a) all Confidential Information furnished to the Undersigned by DLA Piper, (b) all tangible media expression in the Undersigned's control or possession which incorporates any Confidential Information.

5. **Entire Agreement.** This Agreement represents the entire understanding and agreement of the parties hereto and may be modified or waived only by a separate writing signed by the parties hereto expressly so modifying or waiving this Agreement.

6. **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of California.

Signature: _____      Signature: _/s/ illegible_/
Mark S. Ackerman                                      For DLA Piper US LLP

                                                                          Erica Pascal

Date: _August 24 2012_____         Date         August 24, 2012
WEST\231901162.2

9